UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SINOPE SHIPPING CO. LTD.,                           :
                                                    :
                    Plaintiff,                      :
                                                    :
        - against -                                 :
                                                    :
INDUSTRIAL CARRIERS INC. a/k/a ICI,                 :
WEAVER INVESTMENTS INC.,                            :
SELENE SHIPMANAGEMENT SA,                           :
AUSTER MARINE CO. and                               :
DIAMANT CO. LTD.,                                   :
                                                    :
                    Defendants.                     :
-----------------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, SINOPE SHIPPING CO. LTD. (hereinafter "Plaintiff"), by and through its

attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the

Defendants, INDUSTRIAL CARRIERS INC. a/k/a ICI (hereinafter "ICI"), WEAVER

INVESTMENTS INC. (hereinafter "WEAVER"), SELENE SHIPMANAGEMENT SA

(hereinafter "SELENE") and AUSTER MARINE CO. (hereinafter "AUSTER") (hereinafter

collectively "Defendants") alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of a maritime contract of charter. This matter also arises under the Court's federal

question jurisdiction within the meaning of 28 United States § 1331 and the New York

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et*

*seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the disponent owner of the motor vessel "EFESSOS" (hereinafter the "Vessel").

3.    Upon information and belief, Defendant ICI was, and still is, a foreign corporation, or other business entity organized and existing under Marshall Islands law.

4.    Upon information and belief, Defendant WEAVER was, and still is, a foreign corporation, or other business entity organized and existing under foreign law, and was, and still is, a trade name, alias, alter-ego, paying agent, receiving agent, and/or joint venturer of ICI who is now, or will soon be, holding assets belonging to ICI.

5.    Upon information and belief, Defendant SELENE was, and still is, a foreign corporation, or other business entity organized and existing under foreign law, and was, and still is, a trade name, alias, alter-ego, paying agent, receiving agent, and/or joint venturer of ICI who is now, or will soon be, holding assets belonging to ICI.

6.    Upon information and belief, Defendant AUSTER was, and still is, a foreign corporation, or other business entity organized and existing under foreign law, and was, and still is, a trade name, alias, alter-ego, paying agent, receiving agent, and/or joint venturer of ICI who is now, or will soon be, holding assets belonging to ICI.

7.    Upon information and belief, Defendant DIAMANT was, and still is, a foreign corporation, or other business entity organized and existing under foreign law, and was, and still is, a trade name, alias, alter-ego, paying agent, receiving agent, and/or joint venturer of ICI who is now, or will soon be, holding assets belonging to ICI.

2

8.      By a charter party dated November 9, 2007, Plaintiff time chartered the Vessel to ICI for one time charter trip consisting of two (2) laden legs (i.e., voyages) within Atlantic. *A copy of the charter party dated November 9, 2007 is annexed hereto as Exhibit "1".*

9.      Plaintiff delivered the Vessel into the service of ICI and has at all times fully performed its duties and obligations under the charter party.

10.     The charter party provides for a daily hire rate of $42,000.00 per day pro rata including overtime. *See Ex. 1, Clause 4 (lines 45-46).* The charter party obligated ICI to pay to Plaintiff hire for the Vessel every 15 days in advance. *See Ex. 1, Clause 5 (lines 54-59).*

11.     The Vessel carried out the intended voyages and was re-delivered to Plaintiff by ICI on or about April 8, 2008.

12.     ICI has failed to remit payment for all Vessel hire and other sums due under the charter party in the total sum of $132,735.37 as per Plaintiff's pre final hire statement. *A copy of Plaintiff's pre final hire statement is attached hereto as Exhibit 2.*

13.     ICI's failure to pay in full the Vessel hire due and payable to Plaintiff and failure to remit payment for other sums due and payable to Plaintiff constitutes a breach of the charter party.

14.     As a result of ICI's breach of the charter party as aforesaid, Plaintiff has sustained damages in the total principal amount of $132,735.37, exclusive of interest, arbitration costs and attorneys fees.

15.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. *See Ex. 1, Cl. 63.* Plaintiff specifically reserves its right to arbitration of its claims.

3

16.     Plaintiff will commence arbitration after the commencement of this action and jurisdiction is obtained over Defendant(s).

17.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

18.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| A. | Principal claim: | $132,735.57; |
|---|---|---|
| B. | Estimated interest on claim 2 years at 7% compounded quarterly: | $ 19,761.91; |
| C. | Estimated arbitration costs and attorneys' fees and expenses: | $ 50,000.00; |
| **Total:** | | **$202,497.48.** |

19.     Upon information and belief, Defendant ICI is the alter-ego of Defendants Weaver, Selene, Auster and Diamant because it dominates and disregards Weaver's corporate form to the extent that ICI is actually carrying on Weaver's business and operations as if the same were its own, or vice versa.

20.     Upon information and belief, Defendants Weaver, Selene, Auster and Diamant are mere shell-corporations through which Defendant ICI conducts its business, or vice versa.

21.     Upon information and belief, Defendants Weaver, Selene, Auster and Diamant have no *bona fide* separate, independent identity from Defendant ICI.

4

22.     Upon information and belief, ICI uses Defendants Weaver, Selene, Auster and Diamant as "paying/receiving agents" or "pass through" entities such that it can insulate itself from creditors relating to its commercial obligations and in particular its vessel charters. *See copies of ICI's Statement of Accounts dated December 19, 2007 (M/V Pioneer Sky) and February 27, 2008 (M/V Four Earth) sent to Dynacoal in which ICI directed Dynacoal to remit freight payments not to ICI but rather to Weaver attached hereto as Exhibit 3. See also copies of wire remittances made by ICI to Plaintiff for Vessel hire (M/V Efessos) via Selene and Auster attached hereto as Exhibit 4.*

23.     It is not general practice in the maritime community, nor any where else, for independent companies to make or receive large payments on behalf of other independent companies.

24.     Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

25.     Upon information and belief, ICI directs its debtors to makes payments to Defendant Weaver where ICI's debtors have absolutely no contractual obligation to Weaver, or vice versa. *See Exhibit 3.*

26.     Upon information and belief, ICI issues invoices to third parties for its services and directs payments to be made to Defendant Weaver, where Weaver has no contractual relationship to such third parties. *See Exhibit 3.*

27.     Upon information and belief, ICI makes payments via Defendants Selene and Auster where these entities have absolutely no contractual or other obligation to ICI's creditors, or vice versa. *See Exhibit 4.*

28.     Upon information and belief, ICI presents invoices for payments to be made by Defendants Selene and Auster for services and/or goods received by ICI and where Selene and Auster have received no consideration or benefit from the services and/or goods received by ICI. *See Exhibit 4.*

29.     Based on the foregoing, as well as other activities, ICI and Defendants Weaver, Selene, Auster and Diamant should be considered as a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of Weaver, Selene and Auster susceptible to attachment and/or restraint for the debts of ICI.

30.     By virtue of the foregoing, Defendants Weaver, Selene, Auster and Diamant are properly considered as parties to the subject contract as the trade name, alias, alter ego, and/or paying/receiving agent of Defendant ICI.

31.     In the further alternative, Defendants are partners and/or joint venturers.

32.     In the further alternative, Defendants are affiliated companies such that Weaver, Selene, Auster and Diamant are now, or will soon be, holding assets belonging to ICI, or vice versa.

33.     The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

6

34.     Although there is a registration for a foreign corporate entity with the New York Department of State – Division of Corporations' online database for "INDUSTRIAL CARRIERS INC." this does not establish a presence in this district such that this Court should decline to issue the Ex Parte Order authorizing Process of Maritime Attachment and Garnishment sought by Plaintiff.

35.     Further, the aforesaid registration lists the jurisdiction of the entity "INDUSTRIAL CARRIERS INC" as Greece whereas the contractually listed entity in the charter party is noted as Industrial Carriers Inc., Charterers of the City of Majuro, Marshall Islands.

36.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.     That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies,

7

tangible or intangible, or any other funds up to the amount of **$202,497.48** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

    C.    That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

    D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

    E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

    F.    That in the alternative this Court enter judgment against the Defendants on the claims set forth herein;

    G.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

    H.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

8

Dated:    New York, NY
          October 17, 2008

The Plaintiff,
SINOPE SHIPPING CO. LTD.,

By: _____
Kevin J. Lennon
Anne C. LeVasseur

LENNON, MURPHY & LENNON, LLC
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile
kjl@lenmur.com
acl@lenmur.com

9

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Kevin J. Lennon.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          October 17, 2008

Kevin J. Lennon

10

# EXHIBIT 1

---------[ Gogo Bassiakou ]----------

**Marmaras Chartering**                    To  beinav@otenet.gr

28/08/2008 13:06                          cc

                                          bcc  ChartMail@MARMARAS; Names-Chartering

                                          Subject  EFESSOS ICI 09112007
                                          Distribution List: ● 1 ○ 2

FM MARMARAS NAVIGATION LTD PIRAEUS
   CHARTERING DEPT

### EFESSOS ICI CP DD 09.11.2007

HV CHECKED COPY OF A.M. C/P RCVD HERE ON 14.11.2007
AND HV FOUND FOLL DISCREPANCIES:

L 14     BRACKETS INSERT "ISLANDS" BEFORE "MEANS"
CL 6     INSERT "NAABSA IN ECSA ONLY"
L 129    DELETE "LANTERNS AND OIL"

LAST LINES ENUMERATION IS NOT CORRECT

CL 45   2ND LINE INSERT "TILL" BEFORE "RESUMPTION"
CL 58   NEW JASON CLAUSE
         2ND LINE DELETE "FORM MANY" INSERT "FROM ANY"
         5TH LINE DELETE "EARNER" INSERT "CARRIER"
CL 62   MISSING "ENG/BR AFT"
         OWNERS CONFIRM... AFTER "BULKHEADS" DELETE "/etc"
         TTDIMS HEADING TO READ WELL
         CARGO   TANK TOP CLEAR DIMS          CLEAR HEIGHT FM   TANK TOP
         HOLD    FORE/MIDD/AFT/LONG IN MTRS   TANK TOP TO DECK   CLEAR SQR AREA IN
M2
         INSERT CHRTRS PANDI CLUB
CL 67   LAST SENTENCE INSERT "LONDON" AFTER "2"
CL 68   FOR GOOD ORDER'S SAKE "SURINAME, PARANAM, GREAT LAKES, VENEZUELA"
         SHOULD GO AFTER "MOROCCO"
CL 85   LAST LINE TO READ AS PER RECAP I.E.
         AND FREE FROM RUSTSCALES TO INDEPENDENT SURVEYORS SATISFACTION

LATEST BIMCO FUELOIL LOW SULPHUR CONTENT BUNKERS CL IS MISSING
DELETE CLAUSE AT THE END OF THE C/P
FOR YR EASY REFERENCE WORDING AS FOLLOWS:

Bimco Fuel Low Sulphur Content Clause

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply
fuels
of such specifications and grades to permit the Vessel, at all times, to comply with the maximum
sulphur
content requirements of any emission control zone when the Vessel is ordered to trade within that
zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors
used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL
Annex VI,
including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay,
fines, costs or expenses arising or resulting from the Charterers' failure to comply with this
Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in

accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of
any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not
otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure
to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI
and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US
Environmental Protection Agency.

++

PLS AMEND ORIGINAL C/P AS ABOVE AND FORWARD SAME TO OUR OFFICE

TKS/RGDS

# Time Charter
## GOVERNMENT FORM

*Approved by the New York Produce Exchange*

*November 6th, 1913 -- Amended October 20th, 1921; August 6th 1931; October 3rd, 1946*

1. This Charter Party, made and concluded in...Malta. the 9ᵀᴴ ...day of ...November...~~19~~...2007....
2. Between Sinope Shipping Company Limited, Malta.............................
3. Owners of the good... Maltese FLAG {Steamship/Motorship}.. "EFESSOS".of.. SEE CL.62....
4. of...see clause 62...tons gross register, and....see clause 62...tons net register, ~~having engines of~~ ..............~~indicated horse-power~~
5. and with hull, machinery and equipment in a thoroughly efficient state, and classed...LLOYDS......
6. ~~at~~ ........of about .............. cubic feet grain capacity and about .... SEE CL.62....tons ~~of 2240 lbs~~.
7. deadweight capacity
8. on a draft of.......~~feet...inches~~ on.,......Summer ~~freeboard, inclusive of permanent bunkers~~,
9. ~~which are of the capacity of about...tons of fuel~~, and capable of steaming, ~~fully laden~~, under good weather
10. conditions about .....knots on a consumption of about... SEE CL.62...tons of best ~~welsh coal best grade fuel oil best grade Diesel oil~~,
11. now trading...................................................................................................................
12. ......and...Messrs INDUSTRIAL CARRIERS INC Charterers of the City of MAJURO, MARSHALL ISLANDS...
13. Witnesseth, that the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14.1 (one) time-charter consisting of two (2) laden legs within Atlantic. First leg with bulk harmless fertilizers from Baltic to Brazil-Argentina and 2ⁿᵈ leg from East Coast South America to UK/Continent/Baltic/Mediterranean/ Black Sea/EIRE and Islands (means Canary/Azors/Med Islands/Eire) via safe anchorages, safe berths, safe ports, safe approaches, always within I.W.L. always afloat except naabsa in ECSA only. Naabsa as per clause 6 of nype Charter Party. ~~within~~
    ~~below-mentioned trading limits.~~ Always via ice free ports, berths, approaches, vessel not to force ice or follow ice-breakers. Vessel has no ice class. See CL.49
15. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16. The fulfilment of this Charter Party. Acceptance of dely by the Charterers shall not constitute any waiver of Owners' obligations set above.
17. Vessel to be placed at the disposal of the Charterers, ~~at~~ ...on dropping  last outward sea pilot Antwerp
18. ... any time day or night Sundays and holidays included.....
19. ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6) as~~
20. ~~the Charterers may direct. If such dock, wharf or place be not available time is to count as provided for in clause No. 5~~
21. Vessel on her arrival loadport to be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the ordinary cargo service, {and with full complement of officers, seamen, engineers and ~~firemen~~ for a vessel of her tonnage), to be employed, in carrying lawful merchan- see also clause 85
22. dise, ~~including petroleum or its products, in proper containers~~ excluding...See Clause 39.
23. ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk~~,

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

24. ~~all necessary fittings and other requirements to be for account of Charterers~~), in such lawful trades, between good safe port and/or ports ~~; safe berths in British North~~

25. ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

26. ~~Mexico, and/or South America~~ .................................................................................................. ~~and/or Europe,~~

27. ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

28. ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

29. _____see clause 68............................... .

30. as the Charterers or their Agents shall direct, on the following conditions :

31.     1.     That the Owners shall provide and pay for all provisions, all garbage removal, unless compulsory, wages, also all consular fees necessitated because of the Vessel's nationality of flag and discharging fees of the crew: shall pay for the

32. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including fresh and boiler water also for garbage, ~~lubrication oil, potable water~~

33. and maintain her class and keep the Vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

34.     2.     That ~~whilst on hire~~ the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory and customary Pilotages Agencies,, Commissions,

35. Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

36. a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

37. illness of crew or cargoes carried prior to delivery to be for Owners account. Fumigation ordered because of cargoes carried or ports visited while vessel is employed under this

38. charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

39. ~~of six months or more.~~

40.     Charterers are to provide necessary dunnage, and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

41. ~~Owners to allow them the use of any dunnage and shifting boards already aboard vessel~~

42.     3.     ~~See Clause 57 That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

43. ~~board the vessel at the current prices in the respective ports; the vessel to be delivered with not less than~~ ...................... ~~tons and not more than~~

44. ...... ~~tons and to be re-delivered with not less than........ tons and not more than............ tons.~~

45.     4.     That the Charterers shall pay for the use and hire of the said Vessel at the rate of ...

46. United States Dollars $ 42,000 per day pro-rata including overtime

47. ~~per ton on vessel's total deadweight carrying capacity, including bunkers and~~

48. ~~stores, on and from the time of the day of her.~~ commencing on and from the time of the day of her delivery,as aforesaid, and at

49. and after the same rate for any part of a ~~day, month;~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

50. wear and tear excepted, to the Owners (unless lost) on dropping last outward sea pilot or passing 1 safe port Gibraltar - Baltic range (including UK/EIRE) Pico at any time day or night Sundays and Holidays included.

51. ...unless otherwise mutually agreed GMT to apply both ends .

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

52. . ~~Charterers to give Owners not less than. So that chrtrs to tender 15/10/5/3 days approx notice and 2~~ ~~and 1 days def notice.~~

53. ~~notice of vessels expected date of re-delivery, end probable port.~~

54. 5. Payment of said hire to be made to Owners' bank as per Clause 66 in cash in United States Currency,

55. every 15 days in advance, and for the last half month or

56. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

57. due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

58. hire, or bank guarantee, or on any repudiatory breach of this Charter Party **subject to clause 42**, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

59. terers, without prejudice to any claim they {(the Owners) may otherwise have on the Charterers. First hire and value of bunkers on delivery to be paid within 2 London banking days after Vsl's delivery. ~~Time to~~ ~~count as from vessel's delivery. from 7 a.m. on the working day~~

60. ~~following that on which written notice of readiness has being given to the Charterers or their Agents~~ ~~before 4 p.m., but if required by Charterers, they~~

61. ~~to have the privilege of using the vessel at once, such time used to count as hire.~~

62. Cash for vessel's ordinary disbursements at any portmay be advanced as required by the Captain, by the Charterers or their Agents, after obtaining Owners' concent subject to 2.5% commission and such advances shall be deducted from the hire.The Charterers, however, shall in no way be responsible for the application of such advances.

63. 6. That the cargo or cargoes be laden and/or discharged in any **safe** dock or at any **safe** wharf or **safe place** that Charterers or their agents may

64. direct, provided the vessel can safely lie always afloat at any time of tide, Owners warrant vessel is fully equipped with all mooring lines/ropes required by international safety practice, however, in case at any port of call , instructed by Charterers , additional lines/mooring ropes are required , same to be for Charterers' account

65. 7. That the whole reach of Vessel's Hold, no deck cargo is allowed under this charter party and usual places of loading (not more than she can reasonably stow and carry), also

66. accommodations for Supercargo, if carried, shall be at Charterers' disposal reserving only proper and sufficient space for Ship's officers, crew,

67. tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as~~ ~~accommodations allow, Charterers~~

68. ~~paying Owners ..................... per day per passenger for accommodations and meals. However, it is~~ ~~agreed that in case any fines or extra expenses are~~

69. ~~incurred in the consequences of carriage of passenger, Charterers are to bear such risk and expense.~~No passengers allowed.

70. 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

71. boats. The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers as regards employment and

72. agency; and Charterers are to load, stow, and trim, and **discharge** the cargo at their expense under the supervision of the Captain, who is to ~~authorize Charterers' Agents to~~ sign Bills of Lading for

73. cargo as presented, in conformity with Mate's receipts. **Charterers and or their agents are hereby authorised by owners to sign on master's behalf the original bills of lading as presented in accordance with signed mates receipts without prejudice to the charter, provided that such authorisation can be specifically assigned by chrts to their nominated agent. Chrts have the option to reissue second full set of original bills of lading strictly in conformity with the full set of the first original bills of lading, except name of shippers/consignees and/or destination, which maybe changed by the chrts. The first set of original bills of lading to be destroyed and to be sent to owners immediately. All risks /expenses and consequences arising**

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

therefrom to be for charterers' account and responsibility. Discharging ports shown on bills of lading to be always within the terms of this charter party but do not constitute a declaration of discharging port and charterers to have the right to order the vessel to any port within terms of this charter party. In this case charterers to give prior notice thereof well in advance to owners. Charterers hereby indemnify owners against any claim and any additional expenses brought by holders of bills of lading by reason of a change of destination.

74.    9.    That if the Charterers shall have the reason to be dissatisfied with the conduct of the Captain, Officers ,or Engineers, the Owners shall on

75. receiving particulars of the complaint, investigate the same, and, if necessary make a change in the appointments. But this provision does not affect Charterers' right to advance any claim or require Arbitration under CL 17 on disputes regarding the conduct of the Master in prosecution of the voyage and in carrying out the orders and directions of the Charterers

76.    10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that the voyages are prosecuted

77. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the rate of USD 15.00 per day.

78.  Owners to victual Pilots and Custom Officers, and also, when authorised by Charterers or their Agents to victual Tally

79. Clerks, Stevedore's, Foremen, etc., but max 3 persons daily Charterers paying US$ 1,300 PMPR for victualling/cables/entertainment.

80.    11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, telex or cable and the

81. Captain shall keep a full and correct Log of the voyage or voyages which are to be patent to the Charterers or their Agents, and furnish the Char-

82. terers, their Agents or Supercargo when required, with a true abstract of daily Logs, showing the course of the vessel and distance run and the con-

83. sumption of fuel. The Captain to properly fill in and return all Charterers' forms supplied.

84.  12. That the Captain shall use diligence in caring for the ventilation of the cargo by natural ventilation, weather permitted.

85.  13. That the Charterers shall have the option of continuing this charter for a further period of...............

86. ............................................................................................................................................................
............

87. on giving written notice thereof to the Owners or their Agents ............ days previous to the expiration of the first-named term, or any declared option.

88.    14.    That if required by Charterers, time not to commence before...8th November 2007...00:01 hrs and should vessel

89. not have been delivered notice of readiness on or before...10th November 2007...24:00 hrs. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

90.    15.    That in the event of the loss of time from deficiency Master, Officers or Crew, deficiency

91. of crewmen or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo unless resulting from inherent vice quality of defect of the cargo, dry-docking for the purpose of examination or painting bottom, or by

92. any other cause preventing the full working of the Vessel , the payment of hire shall cease for the time thereby lost ,and if upon the voyage the speed be reduced by defect in or

93. breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof

94. and all extra expenses shall be deducted from the hire.

95.    16.    That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

96. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

97. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

98. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

99. purpose of saving life and property.

100.    17.    Any dispute arising between owners and charterers under this charter party is to be referred to arbitration in London, one arbitrator to be appointed by owners and the other by the charterers, and in case the arbitrators shall not agree then to the decision of an umpire to be appointed by them, the award of the arbitrators or the umpire to be final and binding on both parties. The arbitrators (and umpire, if appointed) are to be commercial men, if the two arbitrators fail to agree upon an umpire, the president of the London maritime arbitrators' association is to nominate an umpire. This charter party is to be governed by, and any arbitration hereunder is to be decided in accordance with, English law.

101.    18.    That the Owners shall have a lien upon all cargoes, and all sub-freights/sub-hires, for any amounts due under this Charter, including General Aver-

102. age contributions, and the Charterers to have lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

103. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrances incurred by them or their agents, which

104. might have priority over the title and interest of the owners of the vessel.

105.    19.    That all the derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

106. Crew's proportion. General Average shall be adjusted, stated and settled according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive and Rule F of~~

107. ~~York Antwerp Rules 1974 as amended 1990, in London English Law to apply,~~ and latest amendments thereto ~~1924 at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by those~~

108. ~~Rules, according to the laws and usages at the port of New York. In such adjustments in foreign currencies shall be exchanged into~~

109. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

110. ~~rate prevailing on last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

111. ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposits as the carrier~~

112. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

113. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

114. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

115. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

116. ~~United States money.~~

117.    ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

118. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

119. ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

120. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

121. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

122. ~~ships belonged to strangers.~~

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Destworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

123.     Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. Hire and bunkers not to contribute to general average.

124.   20.   Bunkers used by the vessel while off hire, ~~also for cooking, condensing water, or for grates~~ and stoves to be agreed to as to quantity, and the

125. cost of replacing same, to be allowed by Owners.

126.   21. No DD unless in case of emergency ~~delete all refs to gear as vessel is gearless owners addition at all ports of call compulsory shore watchmen to be for charterers account That as the vessel may be from time to time employed in tropical waters during the term of this Charter, vessel is to be docked at a~~

127. ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary at least once in every six months, reckoning from~~

128. ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

129.   22.   Owners also to provide on the vessel electric lights as on board to be sufficient for working all holds simultaneously lanterns and oil for night

130. work, and vessel to give use of electric light when so fitted

131.   23.   Vessel to work night and day if required by Charterers', and all winches to be at Charterers' disposal during loading and discharging;

132. ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

133. ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

134. ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~

135. ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

136. ~~thereby~~ Ship's guard/watchmen from Vessel's crew for Owners' account. If shore watchmen compulsory at all ports of call, all expenses incurred for same to be for Charterers' account.

137.   24. See Clause 61.   ~~It is also mutually agreed that this Charter is subject to all terms and provisions of and all the exemptions from liability contained~~

138. ~~in the Act of Congress of United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~

139. ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

140. ~~of which are to be included in all bills of lading issued hereunder~~ :

141.                         ~~U.S.A. Clause Paramount~~

142. ~~This bill of lading shall have effect subject to the provisions of the Carriage of goods by Sea Act of United States, approved April 16,~~

143. ~~1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any~~

144. ~~rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

145. ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

146.                       ~~Both to Blame Collision Clause~~

147. ~~If the ship comes into collision with another ship as a result of the negligence of other ship and any act, neglect or default of the~~

148. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried~~

149. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

150. ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

151. ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

152. ~~owners as part of their claim against the carrying ship or carrier.~~

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

155.    25.    The vessel shall not be required to enter any ice bound port, or any port where lights or light ships have been or are about to be with drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. **Vessel not to force ice nor to follow icebreakers.**

26.    Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

153.navigation of the vessel, her seaworthiness, acts of pilots of tugboats, insurance, crew, and all other matters, same as when trading for their own account.

154.    27.    A commission of 2½ 1.25 per cent is payable by the Vessel and Owners to

155.........................BELNAV INC............................................... ...............................

156.on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

157.    28.    An address commission of 2.5 per cent payable to...**Charterers**...on the hire earned and paid under this Charter.

Clauses 29 to 89 inclusive together with New Both to Blame Collision Clause, New Jason clause, Conwartime 1993 clause, P+I Bunkering clause, Paramaount Clause, as attached hereto, are deemed to be fully incorporated to this charter party and be inserted in all bladings issued.

*The Owners*                                              *The Charterers*

This is a computer generated NYPE 46. Any insertion or deletion must be clearly visible. In event of any modification being made to the reprinted text of this document, which is not clearly visible, the original approved document shall apply. Dataworks assume no responsibility for any loss or damage caused as a result of discrepancies between the original approved document and this form.

## Additional clause to the charter party MV EFESSOS / Industrial carriers Inc dated 9 November 2007

### Clause 29

Owners to keep Charterers well advised of the Vessel's program and give Charterers notice on fixing and then daily.

### Clause 30 - On-hire and off-hire surveys

Joint on-hire and off-hire surveys shall be held to ascertain the quantities of bunkers remaining on board on delivery and redelivery respectively. The on-hire survey shall be held at the first port of call after delivery in owns' time, if loading is thereby delayed or interrupted. The off-hire survey shall be held at the redelivery port in charterers' time. The master and/or chief engineer will act on behalf of owners during both surveys, and charterers are to appoint and pay for their own surveyors.

### Clause 31—P + I and Club

Owners guarantee that the Vessel will on delivery be entered with and throughout the currency of this Charter Party remains entered with a protecting and indemnity association, which is member of the International Group of protecting and indemnity clubs. Entry shall include, but not be limited to, fully cover for cargo claims of any nature.

### Clause 32

The Vessel is warranted to be a single-deck selftrimmed bulk carrier.

The Vessel to be suitable for grab discharge with no obstructions in holds and no cargo to be loaded in places inaccessible for grab discharge or in deep tanks. Any time lost to cargo being loaded in such inaccessible places to be considered off-hire, and any additional discharging costs to be for Owners' account,

Owners guarantee that Vessel hatch covers are to be watertight all throughout this charter period and if any hatch cover found defective, same to be rectified at Owners' time and expenses unless such defects are caused by Charterers/Charterers' servants/stevedores or caused by cargo loaded by Charterers. Charterers also have the right to carry hose test on all hatches at any time during this Charter.

### Clause 33

Charterers to pay Owners a lumpsum of USD$ 4,500 — in lieu of cleaning holds on redelivery, also including removal/disposal of dunnage/lashings/debris etc.

### Clause 34

Without prejudice to the generality of Owners' obligations set out in this Charter the Vessel will comply with any safety regulations and/or requirements in effect at ports of loading and/or discharging, particular reference is the United States Department of Labour Safety and Health Regulations set forth in Part III of the Federal Register, or any new regulations which might may from time to time come into force replacing same. Although other provisions of this Charter makes it the responsibility of Owners, it is agreed that should the Vessel not meet these Safety Rules and Regulations,

Owners will make immediate corrective measures and any stevedore standby time and other expenses involved, including off-hire, will be for Owners' account.

## Clause 35

The Vessel to have valid certificate for loading grain without grain fittings when full holds and it is understood that the Vessel can sail with two slack holds as per vessels's manual but not less than 78 pct utilized capacity of each hold without bagging, strapping or shifting boards.

The Vessel to be delivered with valid deratisation or deratisation exemption certificate and, if these do not cover the whole period of the time charter and fumigation is again necessary due hereto or due to anything for which Owners are responsible, cost of same and detention to be for Owners' account. If fumigation is necessary on account of cargo carried under this Charter-Party cost of same and time to be for Charterers' account including expenses involved with placing crew ashore if same required due nature of fumigation of cargo.

For the carriage of grain in bulk the Vessel to have on board at any time of this time charter period the valid documents and certificates issued by a recognized Classification Society and certificates issued by Cargo Bureau on the basis of Solas 1974. Furthermore, the Vessel has on board approved table of heeling movements for 'filled holds-untrimmed ends' in accordance with BIMCO BC XIX/INF. 4 or latest up-to-date amendments.

## Clause 36

Throughout the period of the Charter, the Vessel shall have on board current valid Panama and Suez Canal measurement certificates and will comply with all applicable requirements, regulations and recommendations so as to avoid delay in transit of these canals.

## Clause 37

The Vessel has never called Cuba. Owners guarantee that the Vessel is not blacklisted by the International Longshoremen Associations or any Arab country' nor any local unions due to previous trade. The Vessel has not called at any Siberian or East Russian port since JANUARY 2000.

## Clause 38

Owners warrant that at the time the Vessel is placed at Charterers' disposal, the Vessel shall fulfill the descriptions, particulars and capabilities set forth in this Charter, and shall be tight, staunch and strong, in thoroughly efficient order and condition and in every way Fit, manned, equipped and supplied for the service contemplated. Such description, particulars, capabilities and condition of the Vessel to be maintained by Owners throughout the period of the Vessels' service hereunder, perils of the sea excepted.

The Vessel's cargo gear and all other equipment shall at all time be in good working order and comply with the regulations of the countries in which the Vessel can be employed, loaded and discharged under this Charter-party (including I.L.O. Convention Number 32 which statutory in the U.S.A. under Public Law 85-742,Part 9- safety and Health Regulations for long shoring, the United Kingdom Factory and Workshop Act and/or Health and Safety at Work Act) and Owners are to ensure that the Vessel is at all times in possession of a valid and up-to-date certificate of

efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners' agents to comply with the aforementioned regulations, or because the Vessel is not in possession of such valid and up-to-date certificate of efficiency, any delay there from shall be for Owners' account and Owners to pay all extra expenses, and hire shall cease for actual time lost to Charterers until Vessel is in a position to comply with aforementioned regulations.

## Clause 39 — Cargo exclusions

Only cargoes Charterers are allowed to load on the vessel whilst under this charter is bulk harmless fertilizers, intention DAP, MAP, MOP. All dangerous, explosive, hazardous, inflammable, toxic, injurious or corrosive substances or goods as per IMDG code / acids / ammonium nitrate / ammunition / animals / arms / asbestos in any form / asphalt / automobiles / bitumen / bones or bone meal / borax / calcium carbide, hypochlorite or oxychloride / cement in bulk / cement clinker / charcoal / clay / cocoa / coffee / containers / copra / cotton or cotton waste / creosote or creosoted goods / direct reduced iron in any form / drugs / esparto grass/ essential oils / explosives / detonators or blasting caps / ferrosilicon / firearms / fire briquettes / fishmeal / granite blocks or any other stone blocks / hides / jute / lime / livestock / logs / manioc / mineral sand / mobile homes or caravans / naphtha / narcotics / nickel ore / nuclear substances or fuels / palm kernels / petroleum coke / petroleum derivatives or any petroleum product / pitch / potassium nitrate (saltpeter) / poultry / radioactive substances, products or waste / rags / refrigerated cargo / salt / scrap metal in any form including motorblocks, turnings and swarf / seed cake, seed meal, oil cake or seed expellers / sinter ore / solvents / specie / silica sand / soda ash / spices / sponge iron / sulphate in bulk / sulphur / tar and all its products / tea / tobacco or tobacco products / trucks, lorries or any other vehicles / waste or old paper / timber products and plywood / Chilean nitrates / all cargoes require $CO_2$ fittings, elvent and A60 insulation.

Cargoes requiring electrical or mechanical ventilation, A60 insulation between engine room and hold No. 5, cargoes requiring D P C in Brazil as well as all kind of expellers, bulk rice, bulk copra, bulk pke all are specifically excluded. Additionally all cargoes listed under IMO Appendix B BC code to be specifically excluded.

## Clause 40

Charters have the option to lighten or top-off the Vessel, and if such option is exercised, the Vessel will proceed to a safe anchorage as directed by Charterers and there lighten or top-off as ordered. Master will co-operate with regard to the securing together the MV EFESSOS at anchorage. At all times during this maneuvered and port lighters-barges and/or lightening, operations shall be under the direction of the master and/or pilot of the lightening/ port lighters-barges. Any damage and/or loss of time suffered by the Vessel during either securing together or casting off from the lightening/ port lighters-barges or during port lighters-barges and/or lightening operation shall be at Charterers' expenses. The above operations will be made to or from suitable port lighters-barges, equipped with the necessary suitable fenders. Above operations are at Master's discretion as to safety. Any extra insurance owners have to pay to maintain necessary cover is for Charterers' account.

## Clause 41

Owners are to settle stevedore damage claim direct with the stevedores if possible. Charterers not to be responsible for stevedore or other damage to the Vessel unless notified in writing by the Master within 24 hours of occurrence of the damage. The Master is to co-operate with Agents in giving prompt notice of claim in writing to party causing damage and securing their acknowledgement if possible. Copy of correspondence together with original letter acknowledging liability, if any, to be sent to Charterers and/or their Agents. Master shall immediately report on damage telegraphically to Charterers. If stevedoring damages do not affect Vessel's seaworthiness, class, cargoworthiness, future trading Charterers to have the option to redelivering the Vessel without repairing same; same to be rectified during next scheduled dry-docking and Charterers to refund cost of such repairs against presentation of originals invoices from Repairers .Damages affecting Vessel as described above are to be repaired immediately upon occurrence in Charterers' time and expense.

## Clause 42

Payment of the Charter hire will be made in accordance with Clause 4 but owners shall immediately inform Charterers should hire due not have been received on due date. Charterers shall then within 2 London banking days after receiving such notice arrange to rectify the situation. Should Charterers fail to do so. Owners have the right to withdraw the Vessel as well as act in accordance with clause of this charter.

First hire payment and bunkers will be made in 2 London banking days after delivery.

## Clause 43

Should the Vessel be put back on a voyage by reason of any accident or breakdown of Vessel for which Vessel, owners found to be legally responsible, the hire shall be suspended from the time of her putting back until she is again in the same position or equivalent and voyage resumed there from. The Time so lost and the cost for any extra fuel consumed in consequence thereof and expenses directly incurred thereby shall be deducted from hire.

## Clause 44

Should the Vessel be arrested during the currency of the Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire under this Charter shall not be payable in respect of any period whilst the vessel remained unemployed as a result of such arrest, i.e. the state of arrest having no bearing on hire unless the Vessel is prevented from working thereby. Any direct expenses/losses arising to Charterers due to such arrest to be paid by Owners.

## Clause 45

In the event of a strike of a part of the ship's crew preventing the Vessel from normal working and sailing, the hire shall be suspended from such time resumption of the work. Any direct expenses/losses arising to Charterers due to such event to be paid by Owners.

## Clause 46

Owners always to be responsible for any boycott of the Vessel by I.T.F and/or their affiliates.

Should the Vessel be boycotted ,blockaded or blacklisted in any port or place because of her ownership, management flag or crew,or conditions on which the crew are employed,all expenses,delays or any other consequences,including off-hire,to be of Owners' account.In the event of the Vessel being denied or restricting in the use of port and/or discharging facilities or shore labour and/or tug or pilotage assistance because of actions by Master,Officers or crew,the Vessel's flag or ownership or management or the wages or the conditions of employment of their Officers and/or crew or of the Officers an/or crew of any other Vessel under the same ownership or management or because of the previous trading of the Vessel or any other Vessel as aforesaid,hire shall cease for the time hereby lost and Owners shall be responsible for and shall promptly reimburse Charterers all extra expenses which Charterers may incur in trying to solve the situation,including proceeding to an alternative berth or port.

### Clause 47

Owners to be responsible for all consequences of smuggling, attempted smuggling, or similar offences by Master ,Officers or crew and any detention of the Vessel caused thereby to count as off-hire, unless such offences are caused by Charterers' agents or servants, in which Case Charterers to be responsible for such consequences and Vessel to remain on hire for the entire duration. Any direct expenses/losses arising to Charterers due to such event to be paid by Owners.

### Clause 48

The Vessel to work day and night if required by Charterers. All intermediate opening or closing of hatches to be for Charterers' account if performed by shore labour but to be performed by Vessel's crew at no cost to Charterers' if permitted by local authorities.

### Clause 49

Any delay due to non-compliance or any lack of proper documentation or equipment is to be treated as off-hire and any expenses directly incurred thereby to be for Owners' account, unless such non-compliance is due to the default of Charterers, Sub-Charterers or their Agents.

### Clause 50

No DD during the currency of this charter except for in case of emergency.

### Clause 51

Charterers have the right to deduct from last sufficient hire payment(s) estimated value of bunkers on board of redelivery. Master to keep sufficient cash to cover all owners' items.

### Clause 52

Extra insurance on cargo owing vessel's age, class, flag, ownership to be for Charterers account.

### Clause 53

Should the Vessel be lost, hire shall cease at noon on the day of her loss, and should the Vessel be missing, hire shall cease at noon on the day she was last heard of, and any hire paid in advance and not earned, shall be returned to Charterers.

If the Vessel is requisitioned for use, she shall be deemed off-hire during the period of requisition and any hire paid in respect of such requisition period shall be for Owners' benefit. Any period during which the Vessel is requisitioned shall count as part of the period provided for in this Charter. Charterers have the option to cancel this Charter if off-hire period exceeds 15 days.

## Clause 54

If war or actual hostilities that are directly influencing the trading of the Vessel break out between any two or more the following countries: U.K., Russia, U.S.A., France, People's Republic of China, Japan, Germany, Norway, both Owners and Charterers shall have the right to cancel this Charter. It is understood that war or actual hostilities means war or hostilities directly between these nations and does not include local hostilities or civil war where any of the above countries supports opposing sides.

## Clause 55 - Stevedores

The Stevedores although appointed by Charterers are to be considered Charterers servants and shall load , stow, dunnage and lash, trim and discharge the Vessel under the supervision of the Master. The Master is to supervise the loading, stowage and discharging of cargoes in cooperation with the local authorities.

## Clause 56

Charterers shall give Owners 15/10/5/3 days approx notice of redelivery time and place and 2/1 days definite notice of redelivery date and port.

## Clause 57

Cargo claims shall be settled in accordance with the Inter Club New York Produced Exchanged Agreement, as amended May, 1984 and any subsequent amendments thereto.

## Clause 58

This Charter is subject to the following clauses:

## NEW BOTH TO BLAME COLLISION CLAUSE:

"If the ship comes into collision, with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all losses or the liability to the under or no-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non carrying ship or her Owners as part of the reclaim against the carrying ship or carriers.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in the respect of a collision or contract".

## NEW JASON CLAUSE:

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting form many cause whatsoever, whether due to

negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers consignees or Owners' of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special cargoes incurred in respect of the goods. If a salving ship or ships belong to strangers. Such deposit as the carrier or his agents made deem sufficient, to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery.

### Clause 59

The following clauses are to be incorporated in all Bills of Lading issued here under:

## BOTH TO BLAME COLLISION CLAUSE

## NEW JASON CLAUSE

## CONWARTIME 1993 CLAUSE

## GENERAL PARAMOUNT CLAUSE

This Bill of Lading have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the international Convention, dated Brussels 25th August 1924 and which is compulsory applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or any increase of any of its responsibilities or liabilities thereunder. If any term of the Bill(s) of Lading be repugnant to any extend to any legislation by this clause incorporated, such term shall be void to that extent but no further.

## P&I BUNKERING CLAUSE

The Vessels shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such port are on or off the direct and/or customary route or routes to the ports of loading or discharging named in this Charter party and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deeptanks and nay other compartments in which oil can be carried whether such amount is or is not required for the chartered voyage.

### Clause 60

Owners warrant that throughout the currency of this Charter they will provide the Vessel with the following valid certificates:

Certificates issued pursuant to the Civil Liability Convention 1969 ("CLC")

Certificates issued pursuant to Section 311(p) of the U.S. Federal Water Pollution Control Act as amended (title 33 U.S. Code, Section 1321(p))

Certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter provided always that such legislation incorporated the CLC as amended by the 1984 protocol thereto or contains provision equivalent thereto.

## Clause 61

Owners want that Owners/Disponent Owners has guidelines on drug and alcohol abuse applicable to the Vessel with object that no seafarer will navigate a ship or operate it's onboard equipment while impaired by drugs or alcohol. And that no seafarer will have the use or possession of, or the opportunity to sell or distribute or transport illicit or non-prescribed drugs aboard the Vessel. Further, Charterers expect that Owners/Disponent Owners exercise due diligence throughout the period C/P to ensure that such guidelines are complied with.

## Clause 62 Description of Vessel (all details "about"):

M/V EFESSOS
Maltese flag – single decker log bulk carrier - blt 1982
35554 mt dwat on 11.33 m ssw draft
1,533,300 / 1,468,169 cbft grain/bale
Loa/Beam : 182.71/27.6 mtrs
5 ho/ha – dims : (1) 12.8 x 13.6 (2-5) 19.2 x 15.0
Gear : 4x25 mt cranes
Class : Lloyds
CO2 fitted in cargo holds
No cargo to be loaded on vessel's hatch covers
About 13.0 knots on about 26 mt IFO (ISO 8217/05-RME 180) + about 2.5 mt MDO (iso 8217/05 DMB)
Port cons gear idle/working about 2/3 mt MDO .
Vessel burns extra MDO when manoeuvring in/out ports/canals/rivers etc.
No mixing of bunkers of different origin.
All details about.

Owners style          : SINOPE SHIPPING COMPANY LIMITED, MALTA

Managers              : MARMARAS NAVIGATION LTD


Owners confirm:

Vessel to be fully P&I covered for the duration of voyage.

Vessel is fully insured for H=M for the duration of the voyage with recognized international insurers

Vessel is SDBC Vessel with no obstacles/stanchion in holds

Vessel's tanktop is of steel construction and in good condition

Vessel's holds/hatches are free of any obstacles/bulkheads/etc.

Vessel will comply with ITF requirements at all ports of call.

Vessel is suitable for grab discharge.

Vessel is fully classed and fully certified with highest LLOYDS class for the duration of the Charter Party voyage


Owners warrant that during the currency of this Charter Party :

— Vessel shall not change ownership without Charterers' consent

- — Vessel's hull and machinery insurance shall be fully maintained

- — Vessel not to be sold for scrap after this voyage

- — Vessel's P&I Club shall be fully maintained

- — During the currency of this Charterparty, the Owners shall procure that both the vessel and the "Company" (as defined by the ISM code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Ex name : EX FRESIA

REGISTER NBR : PORT OF REGISTER : VALLETTA REG NO 3875

LAST 4 CARGOES : BULK CONCENTRATES, BULK METCOKE, BULK

FERTS, BULK GRAINS

YEAR/MONTH/PLACE BUILT : 1982 - 20 MAY – JAPAN

FLAG     : MALTESE

SPEED/CONS     : AS DESCRIBED IN THE FIXTURE RECAP

NUMBER OF HOLDS/HATCHES     : 5/5

FLAT TANK TOP DIMS : (measured on vessel's plans believed correct but without guarantee.

CARGO TANK TOP CLEAR DIMS CLEAR HEIGHT FROM TANK TOP CLEAR HOLD FORE/MIDD/AFT/LONG. IN MTRS TANK TOP TO DECK SQR ARE IN M2

| NO 1 | 08.00/14.50/19.50/18.21 | 13.90 M 250.38 |
|------|-------------------------|----------------|
| NO 2 | 20.00/23.60/24.00/27.20 | 13.90 M 598.40 |
| NO 3 | 24.00/24.00/24.00/27.20 | 13.90 M 652.80 |
| NO 4 | 24.00/24.00/24.00/27.20 | 13.90 M 652.80 |
| NO 5 | 24.00/20.00/11.00/27.20 | 13.90 M 435.20 |

- Hatch dimensions     : (1) 12,80 x 13.60 (2-5) 19,20 x 15,00 mtrs

- Type of hatchcovers     : Folding type hatch covers

- Tanktop strength     : No 1,3,5 : 14,50 mts / M2 – No 2,4 : 12,00 mts/M2

- GRT/NRT     : 20533 / 12099

- Summer / tropical / winter dwat / draft

   Summer : about 35554 mts on about 11,330 mts swdraft TPC 42

   Tropical : about 36561 mts on about 11,565 mts swdraft TPC 42

   Winter  : about 34563 mts on about 11,095 mts swdraft TPC 42

- Lightship : 8180

- FW allowance on summer draft : 260mm

- FW allowance in light condition : 120 mm

- Whether any modifications changing lightship by more than 10 mt : NO

- Grain capacity total and per hold :

| GRAIN | BALE (in cbft) |
| --- | --- |
| 180655,71 | 168628,95 |
| 340357,46 | 325396,40 |
| 341387,59 | 330143,40 |
| 345026,06 | 330271,59 |
| 327873,38 | 313728,80 |

Distance waterline to top of hatchcoaming in ballast condition including flooding of floodable hold No 3 No 1 10,50 m – No 5 10,00 mts about

Distance waterline to top of hatchcoaming in ballast condition excluding flooding of floodable hold No 3 from No 1 : 12,5 m to No 5 : 11,5 m about

Distance waterline to topmast in ballast condition (including flooding of floodable hold No 3) : 35,5 mtrs about

Distance waterline to topmast in ballast condition (excluding flooding of floodable hold No 3) : 37,5 mtrs about

Ballast capacity without hold flooding : 9553 cubmtrs
Ballast capacity including flooding hold nos.: 19220 cubmtrs

- Constant about 400 mtns excluding fw

- Fuel grade (IFO/MDO) : as per vessel's description in fixture recap

- Fuel tanks capacity : IFO about 1250 including LSFO tank MDO about 300mt

- Fw tanks capacity / fw daily consumption : about 280 mt / 20 mt daily

- If vessel has manifold port and starboard and pumping rate : YES in fronT of ACC. P/S, about 150 cubmtrs/hour.

- Nationality of Master/crew : Greek / Greek – Philippino – Romanian

- MASTERS NAME : GALIATSATOS EFSTATHIOS

- Vessel's satellite phone/fax/e-mail : as given

- If vessel equipped with bow thruster : NO

- CALL SIGN : 9 H F T 4

- Last/next dry dock : 10/05/2005    09/05/2008

- Last special survey : 08/06/2005     07/06/2010

- When vessel's holds last painted/sandblasted : during last d/d

- If the vessel has been recently inspected by a port state control authority. If Yes, where, when and the result : 16/7 Gdynia – 1 def/cy-pctfd

- If the vessel had serious accident, breakdown, stranding or cargo claim during last 12 months : NO

- H&M Underwriters :

| | |
|---|---|
| SIAT Italy | 30.00% |
| Groupama France | 15.00% |
| Gerling Germany | 15.00% |
| Royal Sun Alliance UK | 12.00% |
| Generali Italy | 13.00% |
| AXA France | 10.00% |
| Lloyd Italico | 5.00% |

H&M USD : 18,800,000 plus USD 4,700,000 increased value

Vessel's contact details

| | |
|---|---|
| INMARSAT C TELEX NO | : 425690211/212 |
| MINI M PHONE/FAX | : 763198729 / 730 respectively |
| PHONE | : 763198729 – 764616770 |
| FAX | : 763198730 / 764616772 |

Standard Bimco ISPS-MTSA Clause, Bimco Standard low sulphur content clause both for Time Charter parties to apply fully.

— **MILLENIUM CLAUSE**

"Year 2000 conformity" shall mean that neither performance nor functionality of computer systems, electronic and electro-mechanical or similar equipment will be dates prior to or during the year 2000

Without prejudice to their other rights, obligations and defences under this charter Party including, where applicable, those of the Hague-Visby Rules, the Owners and Charterers, and in particular the Owners in respect of the Vessel, shall exercise due diligence in ensuring year 2000 conformity in so far as this has a bearing on the performance of this Charter Party.

Charterers' P+I club

Owners' P+I club NORTH OF ENGLAND

Owners have provided fax copies of following certificates:

— Certificate of Vessels' registry

— Class Certificate

— P+I Entry Certificate

## Clause 63 - LAW AND ARBITRATION:

This Charter is governed by and construed in accordance With English Law.Any dispute arising under the Charter to be referred to Arbitration in London. One arbitrator to be nominated by Owners and the other to be nominated by Charterers and in case the Arbitrators shall not agree then to the decision of an Umpire to be appointed by them. The award of the Arbitrators or the Umpire to be final and binding upon both parties. The Arbitrators shall be commercial shipping men.

If either of the appointed Arbitrators refuses to act or is incapable of acting, or dies, the party who appointed him may appoint a new Arbitrator in his place.

## Clause 64

See clause 68

## Clause 65

Deleted.

## Clause 66

Owners' bank for remittance of hire/bunkers payment:

Hire/bunkers payment to be made in U.S. currency by telegraphic transfer to :

ALPHA BANK S.A.

Shipping Branch

89, Akti Miaouli street

185 38 Piraeus – Greece

Swift address : CRBAGRAA

Phone nos. +30 210 4290208

Fax no. +30 210 4290348

FAVOUR : CARYSTOS HOLDING INC

IBAN : GR85 0140 9600 9600 1500 6002 012

Account nr. 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-002012

CORRESPONDENT BANK IN NEW YORK:
CITIBANK NA, NEW YORK
399 Park avenue, New York, N.Y. 10022
ABA : 021000089
SWIFT : CITIUS33
Account nr. 36251442

## Clause 67

Bunkers on delivery about 850 metric tons IFO of which about 130 metric tons is low sulphur IFO in separate tank and about 250 metric tons MDO. Charterers to redelivery the vessel with about 150 metric tons MDO and with the same quantity of IFO/LSIFO as on delivery.

Prices USD 510-535-750 per metric ton of IFO – LSIFO – MDO respectively. Same prices at both ends. Charterers to pay bunker on delivery value with first hire

payment. Charterers have the right to deduct from last 15 days hire payment(s) the value of bunkers on board on redelivery.

Charterers to pay bunkers on delivery value together with first hire latest within 2 banking days after vessel's delivery.

## Clause 68 – Trade exclusion

Cuba, Israel, Turkish occupied Cyprus, Lebanon, Syria, Libya, former Yugoslavia except for Croatia and Slovenia, Albania, Sea of Azov, Denmark, Norway, Sweden, Finland, Iceland, Orinoco, Amazon, Saint Lawrence, East Coast Canada, USEC, USG, Carbs, West Africa except for Morocco are specifically excluded from vessel trade under this Charter, Suriname, Paranam, Great Lakes, Venezuela.

## Clause 69 — Cargo exclusion :

See Clause 39

## Clause 70

Charterers will make every effort to ensure that the original Bills of Lading are tendered to the Master upon vessel's arrival at the discharging port(s). In the absence of original Bills of Lading at discharging port(s) prior to vessel's arrival, Owners to allow discharge/delivery of the cargo against fax presentation of Charterers' L.O.I. in Owners' wording signed by Charterers only. Original of L.O.I. to be forwarded to Owners immediately via broking channel.

## Clause 71

Charterers have the right to supply Ocean Routs or similar advice to the Master during voyage(s) specified by the Charterers. The Master to comply with the reporting procedures of the routing service.

Within the contents of this Charter Party, good weather conditions are understood to mean maximum Beaufort force 4. Weather reports to be taken from the Vessel's deck log and from Ocean Routes Report. In the event of consistent discrepancies between two sources the Ocean Routes report to be taken as ruling.

Should the Vessel's average speed be more than 0.5 knots less than the speed stated in cl.62 in normal weather conditions calculated for complete voyage and should the average consumption be over the consumption stated in Cl.62, Charterers are in liberty to calculate the longer time spent during navigation as well as bunkers consumed in excess, for the purpose of debiting Owners with same. Charterers to submit any claims under this clause not later than 30 (thirty) days from the time of receipt of the voyage sea abstracts.

Charterers to provide Owners with copies of Weather routing supporting calculations.

## Clause 72

Prior to delivery of the Vessel, Owners to try to provide Charterers with copies of the Vessel's capacity plan, hydrostatic curves, deadweight scale, together with copies of the currently approved grain loading and trimming scales.

## Clause 73 — BIMCO ISM Clause

From that date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and the "Company" ( as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request, the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (smc) to the Charterers. Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the owners or the "Company" to comply with the ISM Code shall be for the Owners' account.

## Clause 74 — Ballasting/De-Ballasting

Vessel to ballast/de-ballast clean water ballast tanks only including floodable holds, if required by Charterers or their Agents, at any time during loading and/or discharging, free of expenses to Charterers but in Charterers' time. All ballasting/de-ballasting shall be at the discretion of Master having due regard to port regulations, stability and seaworthiness of the vessel.

## Clause 75

Hire is to include, but not be limited to the following services from the crew.

1) Docking and undocking.

2) Shifting and warping the Vessel during loading and/or discharging alongside.

3) Bunkering.

4) Raising and lowering gangways and safety nets in preparation for loading and discharging.

5) Opening and closing of hatches in preparation for and during loading and/or discharging operations or due to the onset of adverse weather conditions likely to affect the condition of the cargo on board or being loaded and/or discharging.

6) Removing and replacing beams in preparation for loading and/or discharging.

7) Maintaining sufficient power for all lights while loading and/or discharging and caring for same throughout such operations.

8) Supervision of loading and/or discharging and issuing and signing usual stowage plans and Mate's receipts.

9) Attending the Vessel's hatches during sea passage to ensure they remain watertight at all times.

It is understood that certain of the above services may be prohibited by shore labour regulations once in port, in which case the Master will comply with such regulations but will use his best endeavors to perform some of the services at sea whenever possible prior to arrival. If any of the above services are not permitted by local regulations to be carried out by crew then shore labours to be employed by Charterers and same to be for their time and expense.

## Clause 76 — Oil Pollution

a) If the Owners are required to established or Maintain financial security or responsibility in respect of oil or other pollution damage to enable the Vessel lawful to enter, remain in or leave any port, place, territorial or contiguous

waters or exclusive, economic zone of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise may be necessitated to satisfy such requirements at Owners' sole expense.

b) The Owners shall be under the responsibility for all consequences ( including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for the above and any loss of time incurred there by shall be off-hire, unless the same shall be due to the default of Charterers

c) The Owners shall indemnify and hold the Charterers harmless against all consequences (including fines if any imposed to the Charterers) of oil or other pollution damage unless due to Charterers and any failure or inability of the Owners to do so as provided for in the proceeding paragraph (a).

In connection with the preceding paragraph (a), a particular reference is made to a certificate of Financial Responsibility in compliance with requirements the U.S. Federal Water Pollution Act as amended, the Oil Pollution Act of 1990. The Comprehensive Environmental response Compensation and Liability Act as amended, and any amendment thereto,

d) The Owners warrant that the Vessel is entered with the protection and indemnity insurer listed in this Charter Party for the full coverage available for marine pollution risks. In the event the Owners fail to undertake such measures, the Charterers may, at their option, upon notice to the Owners or the Master, do so themselves and any measures taken by the Charterers shall be deemed taken on the Owners' authority and as the Owner's agent, and shall be at Owner's expense except to the extent that any such pollution damage or threat was caused or contributed to be the Charterers.

**Clause 77 - Tax on earnings under the charter.**
Any taxes levied by any government or authority, other than the government or authorities of the country of the owns' domicile or the vessel's flag, in respect of the earnings of the vessel under this charter party shall be for charterers' account.

**Clause 78 - Owners' husbandry.**
It is agreed that the agents appointed by charterers at each port of call under this charter will attend to owners' routine husbandry matters without charging owners with an agency fee.

**Clause 79 - Bills of lading**
a) Charterers are to ensure that all bills of lading issued and/or signed by themselves or their agents or any other party covering cargo loaded under this charter are in strict conformity with the mate's receipts signed by the master or chief officer of the vessel and include all clauses or remarks contained therein.

b) No liner, through, transshipment or combined transport bills of lading, and no waybills, are to be issued under this charter.

c) No original bills of lading shall be carried on board the vessel to the port(s) of destination during the currency of this charter.

d) Charterers are to arrange for their agents at each loading port to furnish owns by facsimile with copies of all bills of lading issued, failing which charterers are to furnish owns with such copies by facsimile themselves.

e) All bills of lading shall be without prejudice to this charter. charterers shall be liable for and shall indemnify owners against all liabilities, losses, damages, delays, costs, expenses, claims or other consequences arising as a result of bills of lading being signed by any party, including the master at charterers' request, which do not comply with the provisions of this clause or with any other provisions of this charter.

### Clause 80 - Resumption of hire.
Notwithstanding any provisions elsewhere in this charter to the contrary, when following a period during which, for whatever reason, the vessel has been placed off-hire or hire has been suspended she comes back on hire at, and/or resumes her voyage from, a position nearer to her original destination than the position at which she went off-hire or hire was suspended, owners are to receive credit for the steaming time and bunkers so saved, even if the vessel is nearer her original destination as a result of having been towed.

### Clause 81 - Additional lien clause.
In addition to the right of lien conferred on the owns according to the provisions of the charterparty lien clause, the owns shall also have a lien over bunkers on board the vessel, as well as over any sums due to time charterers under any sub-charterparties (in addition to freights, sub-freights and sub-hire), for any amounts due under this charterparty, further, in the event that the owns exercise their liberty to withdraw the vessel in accordance with the provisions of the charterparty withdrawal clause, the ownership of all bunkers remaining on board the vessel shall thereupon vest in owns, who shall allow to time charterers by way of credit against any sums due to owns the value of such bunkers calculated in accordance with the provisions of the charterparty bunkers clause applicable on redelivery.

### Clause 82 - Incorporation of standard clauses.
It is mutually agreed that the united states clause paramount, the new jason clause, the both-to-blame collision clause, the conwartime 1993 war risk clause and the p+i bunker deviation clause 1948, as attached, are incorporated in this charterparty and are to be inserted in all bills of lading issued hereunder."

### Clause 83
Any cargo separation required by Charterers further to vessel's hold separation is to be arranged for by Charterers in Charterers' time, risk and expense.
At discharge port(s) dismantling of cargo separation and or dunnage materials removal and disposal to be done by shore labour employed for and paid by Charterers.

### Clause 84 – Pig Iron loading clause
Deleted.

### Clause 85
Vessel on arrival at loadport to present with all holds fresh water washed, dry clean and free from rust and rustscales to relevant surveyors satisfaction.

## Clause 86

Last cargo was bulk concentrates.

## Clause 87

Vessel to provide at no cost to Charterers electrical power, as on board, for receivers grabs and bagging machines. All equipment and labor, including electrician, for such arrangement to be provided by receivers, and in case of need crew and chief engineer to assist.

## Clause 88 – Intermediate hold cleaning

A) If required by Charterers during the currency of this Charter the vessel's crew is to render customary assistance in cleaning the vessel's holds between cargoes, always provided this can be safely done and is permitted by local regulations. Charterers shall pay Owners a lumpsum of Usdlrs 500 per hold for each such cleaning, inclusive of dunnage removal and disposal, (whether or not the vessel's holds pass any subsequent inspection) and the vessel shall remain fully on hire while it is being effected, whether at sea or in port.

B) It is expressly agreed that when intermediate hold cleaning is effected by the crew it is done without any guarantee whatsoever that the vessel will pass any subsequent hold inspections, and Owners/the vessel shall not be in any way liable if the vessel's holds do not pass inspection for the next cargo.

C) Any shore labour required for cleaning holds of cargo residue of cargo carried under this Charter shall be arranged by Charterers and for their account and cleaning is to be carried out in Charterers' time.

## Clause 89

All cargoes to be loaded, stowed, carried on board and discharged always in accordance with latest IMO and local regulations, recommendations.

No deck cargo is allowed.

No alternative holds loading is allowed.

## BIMCO ISPS Clause for Time Charter Parties

(a)

(i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)
(i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)
Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)
If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.
U.S. Customs Advance Notification/ BIMCO AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS 1993 CODE NAME: "CONWARTIME 1993"

(1) For the purpose of this clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the master; and

(b) "War risks" shall include any war (whether actual or threatened), act of war, ciivil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state whatsoever, which, in the reasonable judgment of the master and/or the owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) The vessel, unless the written consent of the owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgment of the master and/or the owners, may be, or are likely to be, exposed to war risks. should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The owners may effect war risks insurance in respect of the hull and machinery of the vessel and their other interests (including, but not limited to,

loss of earnings and detention, the crew and their protection and indemnity risks), and the premiums and/or calls therefor shall be for their account.

(b) If the underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such underwriters as being subject to additional premiums because of war risks, then such premiums and/or calls shall be reimbursed by the charterers to the owners at the same time as the next payment of hire is due.

(5) If the owners become liable under the terms of employment to pay the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the owners by the charterers at the same time as the next payment of hire is due.

(6) The vessel shall have liberty:

(a)To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b)To comply with the orders, directions or recommendations of any war risk underwriters who have the authority to give the same under the terms of the war risk insurance;

(c)To comply with the terms of any resolution of the security council of the united nations, any directives of the european community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)To divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e)To divert and to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this clause, the owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the charterers. no cargo shall be discharged at any alternative port without first giving the charterers notice of the owners' intention to do so and requesting them to nominate a safe port for such discharge. failing such nomination by the charterers within 48

hours of the receipt of such notice and request, the owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this charterparty.

## U.S.A. CLAUSE PARAMOUNT

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved 16 April 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.

If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void as to that extent but no further. The provisions stated in said Act shall (except as may be otherwise specifically provided herein) govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier. The carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the carrier.

## BIMCO FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES

Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to meet the maximum sulphur content requirements of any emission control zone when the vessel is trading within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this clause.

For the purpose of this clause, "emission control zone" shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US environmental protection agency.

### THE OWNERS

### THE CHARTERERS

# EXHIBIT 2

## PRE- FINAL HIRE STATEMENT:

| | | | | US$ |
|---|---|---|---|---|
| HIRE from:<br>09-Nov-07 19:02 | to:<br>08-Apr-08 02:45 | =151.321526 d x $42,000 pd | | 6,355,504.17 |
| OFF-HIRE / UNDER-PERFORMANCE:<br>00-Jan-00 00:00 | 00-Jan-00 00:00 | =0.000000 d x $0 pd | | 0.00 |
| COMMISSIONS: | | 3.750% | | -238,331.41 |
| DELY: IFO<br>DELY: LSFO<br>DELY: MDO | 711.551 mt<br>132.938 mt<br>251.217 mt | $ 510.00 pmt =<br>$ 535.00 pmt =<br>$ 750.00 pmt = | $362,891.01<br>$71,148.58<br>$188,412.75 | 622,452.34 |
| RE-DELY: IFO<br>RE-DELY: LSFO<br>RE-DELY: MDO | 611.190 mt<br>131.000 mt<br>142.920 mt | $ 510.00 pmt =<br>$ 535.00 pmt =<br>$ 750.00 pmt = | $311,706.90<br>$70,085.00<br>$107,190.00 | -488,981.90 |
| OFF-HIRE / UNDER-PERFORMANCE:<br>IFO: 74.910 mt<br>MDO: 7.220 mt | $ .00 per mt =<br>$ .00 per mt = | $0.00<br>$0.00 | | 0.00 |
| CHARTRS EXPS: | IN LIEU OF HOLDS CLEANING<br>C/V/E<br>INTERMEDIATE CLEANING $500x5 HOLDS<br>U/W CLEANING (ESTIMATED) | $ 1,300 per per month | | 4,500.00<br>6,487.44<br>2,500.00<br>5,000.00 |
| OWNERS EXPS: | ST PETERSBURG<br>PARANAGUA<br>SAN LORENZO<br>LAS PALMAS<br>SOUTHAMPTON<br>GLASCOW | | (OWNERS DIRECT)<br>(OWNERS DIRECT)<br>(OWNERS DIRECT)<br>(OWNERS DIRECT)<br>(OWNERS DIRECT)<br>(OWNERS DIRECT) | 0.00 |
| PAYMENTS RCVD: | 1<br>2<br>3<br>4<br>(RCVD $11.00 LESS/BNK CHRGS) 5<br>6<br>7<br>8<br>9<br>10<br>11<br>12 | 13-Nov-07:<br>23-Nov-07:<br>07-Dec-07:<br>24-Dec-07:<br>04-Jan-08:<br>22-Jan-08:<br>05-Feb-08:<br>21-Feb-08:<br>18-Mar-08:<br>03-Apr-08:<br>08-Apr-08:<br>08-Apr-08: | $1,729,477.34<br>$607,025.00<br>$607,025.00<br>$607,025.00<br>$607,025.00<br>$607,025.00<br>$607,025.00<br>$535,605.41<br>$574,959.47<br>$40,362.95<br>$32,667.09<br>$81,135.01 | -6,136,375.27 |
| | | | BALANCE DUE OWNERS: | 152,735.37 |

# EXHIBIT 3



1369

*Registered Office : P.O. Box 1408, Majuro, Marshall Islands, MH. 96960*

# VOYAGE STATEMENT OF ACCOUNTS

19th of December, 2007

| | |
|---|---|
| Charterers | DYNACOAL LIMITED |
| Vessel | PIONEER SKY |
| C/P dated | 10.10.2007 |
| Cargo | DATONG SIZED STEAM COAL |
| Total Loaded Quantity | 74 076,000   MTs |
| Ports of loading | QINHUANGDAO + JINGTANG PORT, CHINA |
| Ports of discharge | NEMRUT BAY + DILISKELESI, TURKEY |

| | | | | | |
|---|---|---|---|---|---|
| Ocean freight | 74 076,000 | mts @ USD | 60,40 per mt | = USD | 4 474 190,40 |
| Deadfreight | 1 200,000 | mts @ USD | 60,40 per mt | = USD | 72 480,00 |
| Total | | | | = USD | 4 546 670,40 |
| Less remitted by Charterers | | | | = USD | (4 039 930,00) |
| Less remitted by Charterers | | | | = USD | (150 445,80) |
| Less remitted by Charterers | | | | = USD | (223 674,52) |
| Less remitted by Charterers | | | | = USD | (118 794,58) |
| Plus demurrage at Loadports | | | | = USD | 118 829,56 |
| Plus demurrage at Dischports | | | | = USD | 255 514,58 |
| Plus 50 pct of cost for draft surveys at Load & Dischports | | | = USD | 1 600,00 |
| Total due to Owners | | | | | 329 769,58 |

Please remit USD    329 769,58    to following bank account:

HSBC BANK PLC
93, AKTI MIAOULI STR., PIRAEUS BRANCH, GREECE
SWIFT NUMBER: MIDLGRAA
IBAN NUMBER:  GR57 0710 0010 0000 0106 6687 071
IN FAVOR OF: WEAVER INVESTMENTS INC
ACC. NO.: 001.066687.071
CORR BANK HSBC BANK USA
SWIFT: MRMDUS33,
ACC. 000047791 OF HSBC BANK PIRAEUS GREECE

WITH REFERENCE: M/V PIONEER SKY / DYNACOAL VSOA



Registered Office: P.O. Box 1405, Majuro, Marshall Islands, MH. 96960

## VOYAGE STATEMENT OF ACCOUNTS

27th of February, 2008

| | |
|---|---|
| Charterers | DYNACOAL |
| T/V | FOUR EARTH |
| C/P dated | 10.12.2007 |
| Cargo | COAL IN BULK |
| Quantity | 69 370,000 mts |
| Port of loading | JINGTANG |
| Port of discharge | DILISKELESI, TURKEY |

| | | | | |
|---|---|---|---|---|
| Ocean freight | 69 370,000 mts @ USD | 50,00 per mt | = USD | 3 468 500,00 |
| Total | 69 370,000 mts @ USD | 50,00 per mt | = USD | 3 468 500,00 |
| Less remitted by Charterers on 22.01.08 | | | USD | (1 999 965,00) |
| Less remitted by Charterers on 29.01.08 | | | USD | (1 295 040,00) |
| Less dispatch at Load Port | | | USD | (8 948,33) |
| Plus expenses due to call Singapore due to cargo heating | | | USD | 172 029,90 |
| Plus demmurage at Disch ports | | | USD | 45 030,00 |
| Plus costs for draft surveys, 50% | | | USD | 900,00 |
| Total due to Owners | | | USD | 382506,57 |

Please remit USD      382 506,57      to following bank account:

HSBC BANK PLC
93, AKTI MIAOULI STR., PIRAEUS BRANCH, GREECE
SWIFT NUMBER: MIDLGRAA
IBAN NUMBER: GR67 0710 0010 0000 0106 6687 071
IN FAVOUR OF: WEAVER INVESTMENTS INC
ACC. NO.: 001.066687.071
CORR BANK: HSBC BANK USA
        SWIFT: MRMDUS33,
        ACC. 000047791 OF HSBC BANK PIRAEUS GREECE.

WITH REFERENCE: MTV FOUR EARTH / DYNACOAL

# EXHIBIT 4

## ALPHA BANK

ΚΑΤ/ΜΑ ΝΑΥΤΙΛΙΑΚΩΝ ΕΡΓΑΣΙΩΝ (0960)

### ΕΙΔΟΠΟΙΗΤΗΡΙΟ ΣΥΝΑΛΛΑΓΗΣ

### ΠΙΣΤΩΣΑΜΕ ΤΟΝ ΛΟΓΑΡΙΑΣΜΟ ΣΑΣ

Ημ/νία    18/03/2008

Ενδειξή σας

Ενδειξή μας   960/91902 ΕΙΣΕΡΧ. ΕΜΒΑΣΜΑ
      20080318949012Ξ995

CARYSTOS HOLDING INC.
C/O MARMARAS NAVIGATION LTD
ΦΙΛΕΛΛΗΝΩΝ 4-6
ΠΕΙΡΑΙΑ ΤΚ 18536
Hold Mail

| | | | | |
|---|---|---|---|---|
| Λογ/σμός   960015006002012 | Αξία | 18/03/2008 | USD | 574.959,47 |
| Ποσό Εμβάσματος   USD | 574.959,47 @ | 1,0000000 USD | | 574.959,47 |
| Προμήθεια | 0,00 | | USD | 0,00 |
| Εξοδα | 0,00 | | USD | 0,00 |
| Εξοδα Telex Advice | 0,00 | | USD | 0,00 |
| Σύνολο | 0,00 | 0,0000000 USD | | 574.959,47 |

Στοιχεία Εντολής

Ληφθέν με    Swift

Απο

MRMDUS33XXX

HSBC BANK USA, N.A.

NEW YORK

452, FIFTH AVENUE

AM 3249

IN 960/91902

Νόμισμα,Ποσό      USD        574.959,47

Αρχική Εντολοδότρια     Διατραπεζικές Πληροφορίες

MIDLGRAAXXX

Εντολέας

GR MCBK 001-065887-071

1/SELENE SHIPMANAGEMENT SA

2/C/O PAGONA KARAGIORGI

2/12 TAXIARCHON STR

2/17563 PALEO FALIRO    PC:17563

Αιτιολογία Πληρωμής

HIRE MV EFESSOS

Το έντυπο δεν χρειάζεται υπογραφή

## ALPHA BANK

KATIMA NAYTIΛIAKΩN EPΓAΣIΩN (0960)

### ΕΙΔΟΠΟΙΗΤΗΡΙΟ ΣΥΝΑΛΛΑΓΗΣ

### ΠΙΣΤΩΣΑΜΕ ΤΟΝ ΛΟΓΑΡΙΑΣΜΟ ΣΑΣ

| | | | | |
|---|---|---|---|---|
| Ημ/νία | 05/02/2008 | | CARYSTOS HOLDING INC. | |
| Ενδειξή σας | | | C/O MARMARAS NAVIGATION LTD | |
| Ενδειξή μας 960/90502 ΕΙΣΕΡΧ. ΕΜΒΑΣΜΑ | | | ΦΙΛΕΛΛΗΝΩΝ 4-6 | |
| 20080205949013Ξ481 | | | ΠΕΙΡΑΙΑ ΤΚ 18536 | |
| | | | Hold Mail | |

| Λογ/σμός 960015006002012 | Αξία | 05/02/2008 | USD | 607.025,00 |
|---|---|---|---|---|
| Ποσό Εμβάσματος   USD | 607.025,00 ¢ | 1,0000000 USD | | 607.025,00 |
| Προμήθεια | 0,00 | | USD | 0,00 |
| Εξοδα | 0,00 | | USD | 0,00 |
| Εξοδα Telex Advice | 0,00 | | USD | 0,00 |
| Σύνολο | 0,00 | 0,0000000 USD | | 607.025,00 |

Στοιχεία Εντολής

Ληφθέν με      Swift

Απο

MRMDUS33XXX

HSBC BANK USA, N.A.

NEW YORK                    :N 960/90502                    ΑΜ   2035

452, FIFTH AVENUE

| Νόμισμα,Ποσό | USD | 607.025,00 |
|---|---|---|

Αρχική Εντολοδότρια·                    .Διατραπεζικές Πληροφορίες

MIDLGRAAXXX

Εντολέας                              Αιτιολογία Πληρωμής

GR MDBK 001-067610-071               HIRE MV EFESSOS

1/AUSTER MARINE CO

2/C/O PAGONA KARAGIORGI

2/12 TAXIARCHON STR

2/17563 PALEO FALIRO      PC:17563

Το έντυπο δεν χρειάζεται υπογραφή